# UNITED STATES DISTRICT COURT

for the

District of Oregon

In the Matter of the Search of
*(Briefly describe the property to be searched or identify the person by name and address)*

Samsung cellphone w/dark-blue case and iPhone w/clear case in DEA custody, as described in Attachment A

Case No. 6:26-mc-514

## APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

A Samsung cellphone w/dark-blue case and an iPhone w/clear case in DEA custody, as further described in Attachment A hereto.

located in the ______ District of Oregon, there is now concealed *(identify the person or describe the property to be seized)*:

The information and items set forth in Attachment B hereto.

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;

☑ contraband, fruits of crime, or other items illegally possessed;

☑ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| *Code Section* | *Offense Description* |
|---|---|
| 21 U.S.C. §§ 841(a)(1) and 846 | Conspiracy to Posses with Intent to Distribute Controlled Susbtances |

The application is based on these facts:

See affidavit which is attached hereto and incorporated herein by this reference.

☑ Continued on the attached sheet.

☐ Delayed notice of ____ days *(give exact ending date if more than 30 days:* ________ *)* is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

/s/ Katherine Jolley, via Telephone
*Applicant's signature*

Katherine Jolley, Special Agent, DEA
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by Telephone at 3:34 p.m. a.m./p.m. *(specify reliable electronic means)*.

Date: May 15, 2025

[signature]
*Judge's signature*

City and state: Eugene, Oregon

Amy E. Potter, United States Magistrate Judge
*Printed name and title*

`DISTRICT OF OREGON, ss: AFFIDAVIT OF KATHERINE JOLLEY

**Affidavit in Support of an Application Under Rule 41**
**for a Warrant to Search and Seize Evidence Including Digital Evidence**

I, Katherine Jolley, being duly sworn, do hereby depose and state as follows:

**Introduction and Agent Background**

1. I am a Special Agent (SA) with the Drug Enforcement Administration (DEA) and have been from May 2016 to August 2020, and since May 2025. My training and experience include the detection, identification, and apprehension of individuals involved in narcotics trafficking offenses, and the investigation of violations of the Controlled Substances Act (CSA), Title 18 and Title 21 United States Code. I have received specialized training from the DEA, to include an 18-week Basic Agent Training program in Quantico, VA. I am familiar with Drug Trafficking Organization ("DTO") investigations, including identifying methods of importation and distribution of controlled substances, and how controlled substances are financed, manufactured, marketed, and distributed. I have interviewed and arrested subjects and operated informants, executed search warrants, conducted physical surveillance, and used electronic and video surveillance, among other investigative techniques and tools.

2. I submit this affidavit in support of an application under Rule 41 of the Federal Rules of Criminal Procedure for a search warrant authorizing the search and examination of two cellular telephones: a dark-blue-colored Samsung with a clear/black case (**Device 1**), and an iPhone with a clear case (**Device 2**) (hereinafter, collectively referred to as "**the Devices**"), located with and seized from Rene CAZARES and currently stored in law enforcement possession, at the Drug Enforcement Administration located at 211 E 7th Avenue, Eugene,

OR 97401, as described in Attachment A hereto; and the extraction of electronically stored information from the Devices, as described in Attachment B hereto. As set forth below, I have probable cause to believe and do believe that the items set forth in Attachment B constitute evidence of the fruits and instrumentalities of violations of 21 U.S.C. §§ 841(a)(1) and 846 ("Target Offenses").

3. This affidavit is intended to show only that there is sufficient probable cause for the requested warrants and does not set forth all of my knowledge about this matter. The facts set forth in this affidavit are based on my own personal knowledge, knowledge obtained from other individuals during my participation in this investigation, including other law enforcement officers, interviews of witnesses, a review of records related to this investigation, communications with others who have knowledge of the events and circumstances described herein, and information gained through my training and experience.

**Applicable Law**

4. Title 21, United States Code, Section 841(a)(1) provides that it shall be unlawful for any person to possess, with intent to distribute, controlled substances.

5. Title 21, United States Code, Section 846 provides that it shall be unlawful to engage in a conspiracy to commit any violation of Title 21, United States Code, Section 841(a)(1).

**Statement of Probable Cause**

6. The United States, including the Drug Enforcement Administration (DEA), Oregon State Police (OSP), Springfield Police Department (SPD), Eugene Police Department (EPD), South Coast Interagency Narcotics Team (SCINT), Corvallis Police Department (CPD),

Corona Police Department, and Homeland Security Investigations (HSI) have been conducting a criminal investigation into a Transnational Drug Trafficking Organization (DTO) transporting drugs into California from Mexico before distributing it across the United States through postal services and vehicles. Law enforcement has identified money couriers and launderers traveling across the United States to pick up large amounts of drug proceeds (U.S. Currency) before being repatriated back to Mexico. The District of Oregon, specifically Lane County, Oregon, has been the primary focus of this investigation and a substantial distribution area for the DTO.

7. As indicated herein, Cesar Armando Ruiz-Gonzalez (Ruiz-Gonzalez) is the Mexico based source of supply (SOS) and dispatcher for the DTO. Rene CAZARES is the stash house operator in Salem, Oregon, receiving large amounts of controlled substances from couriers that he distributes to local Oregon customers at the direction of Ruiz-Gonzalez. Narcotics traffickers frequently use cellular telephones to facilitate and coordinate drug transactions, including communications with customers, suppliers, and co-conspirators.

8. During this investigation, law enforcement has seized (through search warrants, arrests, traffic stops, etc.) and/or directly purchased (through confidential informants and undercover law enforcement), approximately 28 pounds of fentanyl, and 35 pounds of methamphetamine, and multiple firearms from co-conspirators of the DTO.

9. In January of 2026, a confidential source (CS) introduced a law enforcement officer in an undercover (UC) capacity to Ruiz-Gonzalez. The CS is cooperating with law enforcement for consideration on pending drug charges; however, no promises or guarantees have been made to the CS. The CS does have previous charges of dishonesty including tampering with evidence, forgery, unauthorized use of a motor vehicle, false information to

police, theft, and identity theft. The CS has been able to provide information to law enforcement in the past that law enforcement has been able to corroborate as true and reliable through investigative methods.

**A. February 11, 2026, Controlled Buy of 4 Ounces of Fentanyl from CAZARES**

10. On February 10, 2026, law enforcement, working in a UC capacity, used a cellular device to message Ruiz-Gonzalez on WhatsApp to coordinate a controlled purchase of methamphetamine and fentanyl. The UC inquired with Ruiz-Gonzalez about purchasing two pounds of methamphetamine and one ounce of fentanyl "2 clear 1 f" with "clear" used as a code word for methamphetamine by this DTO. Ruiz-Gonzalez responded to the UC stating, "let me know", and advised that methamphetamine was $1,400 per pound, and that fentanyl was $800 per "Piece", which is a common slang term used to describe an ounce of fentanyl.

11. On February 11, 2026, The UC messaged Ruiz-Gonzalez again and advised that the UC was ready to purchase the drugs. Ruiz-Gonzalez responded that "clear" was all out, and that another car with more would be arriving the next day, February 12, 2026. The UC then asked Ruiz-Gonzalez if he had any fentanyl still available, to which Ruiz-Gonzalez responded "freddy we have all day long", and further advised that "clear" goes quickly, as they only take "50 of them" at a time. The UC then responded stating that the UC had enough for "4 f", meaning four ounces of fentanyl. Ruiz-Gonzalez said OK.

12. In anticipation of the controlled purchase, law enforcement traveled to Salem, Oregon, to establish surveillance. The UC was provided with $3,200 to complete the transaction equipped with an audio recorder for safety and evidence collection.

13. The UC then messaged Ruiz-Gonzalez again, inquiring about the location for the

deal. Ruiz-Gonzalez responded with "Salem" and later, "Costco". Surveillance was then established at the Costco as well as CAZARES'S apartment located nearby at 5265 Salal St., Apt. 303, Salem, Oregon, which law enforcement had associated to the DTO through phone record analysis.

14. Once the UC arrived at Costco, the UC messaged Ruiz-Gonzalez advising that the UC was at the deal location. Ruiz-Gonzalez then responded and confirmed that the UC wanted 100 grams of fentanyl and had the cash for it. The UC responded with, "yeah I got 3200".

15. At approximately 3:53 p.m., the UC received a call from cellphone number 971-510-0951 (no subscriber information, as it was a pre-paid Verizon TracFone). The UC answered and an unknown male identified himself as "Peter's nephew", with "Peter" being an alias used by Ruiz-Gonzalez. Of note, law enforcement has identified tolls from customers of the DTO to that number in January of 2026. The male, later identified as CAZARES, confirmed that the UC was at the Costco in Salem and stated he would "get it ready" and to give the UC a call when they were on their way with it.

16. At approximately 4:10 p.m., law enforcement observed a Silver Mercedes ML3 with Oregon license plate 932QMR drive out of the parking lot from the 5265 Salal Street Apartment. Phone number 971-719-8983 appeared on the phone records of Austin Dupre, a suspected co-conspirator of the DTO, that was registered to Kimberly Luna (hereinafter "Luna") whose driver's license listed residency at CAZARES'S apartment. Surveillance was maintained on the vehicle as it drove to Costco. At approximately 4:11 p.m., the UC received another phone call from CAZARES using the same number. CAZARES asked the UC where they were located. The UC responded by saying they were at the Costco parking lot near the Chick-Fil-A.

17. Law enforcement subsequently observed the Mercedes park by the UC's vehicle. Law enforcement observed a male, later identified as CAZARES, wearing a dark colored beanie and glasses, with a red and black-colored tote style bag, exit the driver's seat of the Mercedes and enter the passenger side of the UC's vehicle.

18. Once CAZARES was inside the UC's vehicle, the UC handed CAZARES $3,200. CAZARES proceeded to count the money in front of the UC. Once CAZARES finished counting the money, he took a beanie out of the red and black bag that contained a scale. CAZARES then took out a second beanie that contained a bag of an off-white powdered substance. CAZARES advised the UC that he was weighing it out to show the UC they were getting the amount they asked for. CAZARES weighed the bag at approximately 103 grams. CAZARES advised the UC that it was three grams overweight due to the packaging. CAZARES then took the powdered substance and placed it into a bigger Ziploc bag, then handed it to the UC. The drugs were later sent to the DEA laboratory for analysis and confirmed as fentanyl.

19. CAZARES then exited the UC's vehicle and returned to the Mercedes, then departed the location. The Mercedes then drove to the area of Teal Drive SE in Salem and remained stationary. From my training and experience, I know that drug traffickers often perform "heat checks" in which they turn down random side streets, make random loops, or stop in place to perform counter surveillance for law enforcement. CAZARES appeared to stop in place to observe any law enforcement presence. In an abundance of caution, surveillance was terminated.

/ / /

**B. April 15, 2026, Controlled Buy of 3 Pounds of Methamphetamine and 1 Ounce of Fentanyl from CAZARES**

20. On April 16, 2026, the UC contacted Ruiz-Gonzalez again via cellular device to inquire about purchasing more drugs. Ruiz-Gonzalez stated that he could not guarantee availability of methamphetamine as it goes quickly. Ruiz-Gonzalez eventually advised the UC later that night that they were out of “cold ones”, referring to pounds of methamphetamine. However, they would be getting more the next day, April 17, 2026. Ruiz-Gonzalez also advised that methamphetamine was $1,250 per pound instead of the previous $1,400 per pound.

21. The following morning, the UC messaged Ruiz-Gonzalez to inquire about availability that day for a deal. Ruiz-Gonzalez responded, stating that they would be ready for the UC around 12:00 p.m. to 1:00 p.m. that afternoon. At approximately 11:00 a.m., Ruiz-Gonzalez messaged the UC again stating that they were ready.

22. Based on my training and experience, I know that drug traffickers commonly use cellular phones for planning and organizing drug deals, as well as the collection of drug proceeds, and, in some cases, to warn associates of potential law enforcement activity. Additionally, cellular phones are often used to order and sell controlled substances and then to arrange and coordinate a meet location.

23. At approximately 12:00 p.m., law enforcement established surveillance at the Costco as well as CAZARES’S apartment. The UC was furnished with $4,600 for the deal and equipped with an audio recorder for safety and evidence collection. In anticipation of the drug deal, law enforcement followed the UC from a neutral location to the Costco in Salem, Oregon.

24. At approximately 12:40 p.m., the UC received a phone call from CAZARES. CAZARES stated that they were getting the product ready and that they would send the UC an

address to meet CAZARES to conduct the deal. Approximately four minutes later, the UC received a text from the same phone number with the address: 1024 Sharon Loop SE in Salem, Oregon. The UC drove to the address and waited for CAZARES.

25. At approximately 12:59 p.m., law enforcement observed CAZARES walk out of the front door of his apartment building and continue to a gray Chevrolet pickup truck with Oregon license plate: 449LTQ. CAZARES entered the driver's seat of the pickup truck and departed the area. Surveillance was not maintained because CAZARES had previously exhibited surveillance-conscious driving behavior, however approximately five minutes later, law enforcement observed the pickup truck drive to and park directly behind the UC vehicle on Sharon Loop Drive SE.

26. Law enforcement observed CAZARES exit the driver's seat of the pickup truck with a dark-colored backpack and a red tote-style bag and enter the passenger's side of the UC vehicle. Inside the vehicle, the UC provided CAZARES with $4,600. CAZARES then counted the money in front of the UC. After counting the money, CAZARES provided the UC with approximately three pounds of suspected methamphetamine and approximately one ounce of suspected fentanyl. CAZARES then exited the UC's vehicle and entered the driver's seat of the gray pickup truck. The UC then departed the location meanwhile the pickup truck remained stationary. No field tests were performed for the suspected drugs from this purchase but were sent to a DEA laboratory for further analysis.

27. Approximately one minute after the UC departed the area, CAZARES left the area and eventually turned onto Salal Street SE and parked in front of his apartment building. Law enforcement observed CAZARES exit the driver's seat of the pickup truck and walk toward

the front door of the apartment building. Law enforcement, on foot wearing plain clothes, followed CAZARES to the front door. CAZARES let the law enforcement officer into the building, who proceeded up to the third floor followed by CAZARES. Law enforcement observed CAZARES enter his apartment.

### C. April 29, 2026, Search Warrant at Subject Property, CAZARES Arrested with Devices Exiting Vehicle in Front of Apartment Complex

28. On April 29, 2026, law enforcement served a federal search warrant at the Subject Property (5265 Salal St., SE, Apt. 303, Salem, Oregon). Law enforcement seized suspected fentanyl packaging and residue and drug ledgers. Law enforcement matched undercover purchases of narcotics to the drug ledger notes based on date, quantity sold, and purchase amount. The ledgers also indicated more than 200 drug sales with some occurring as recently as a few days prior to the search.

29. At approximately 7:30 a.m., law enforcement established surveillance in the area of CAZARES'S apartment. At approximately 8:15 a.m., a silver Kia Soul arrived in the area. DEA Salem had advised the day prior that they had observed CAZARES using a silver Kia Soul. The Kia parked and two males exited the vehicle. Law enforcement approached the vehicle and observed the two males and confirmed one of them was CAZARES, who was subsequently detained. Law enforcement conducted a search for weapons on CAZARES at that time and located the Devices on his person.

30. Based on my training, experience, and knowledge of the investigation, drug traffickers will often carry cellular phones to conduct drug trafficking activities, (i.e., collection, storage, and distribution of drugs), including pre-arranged drug deals coordinated with their customers. I believe CAZARES carried the Devices to do just that. On one undercover

occasion noted above, the UC guided CAZARES over his phone to their meet location for a drug transaction indicating CAZARES was carrying and using his cellphone to further his drug crimes.

31. I believe that CAZARES acted as the primary stash house coordinator and local distributor, selling to the DTO's customer base using the Devices. I believe this based off the two controlled purchases that law enforcement has conducted with CAZARES coming to and from his residence, before and after selling an UC officer drugs, and where CAZARES was ultimately arrested with the Devices on his person. As a stash house coordinator and local distributor CAZARES needs cell phones to coordinate the sale of drugs to the DTO's customer base.

32. I have probable cause to believe, and I do believe that the Devices belong to CAZARES, based on their seizure from his person and the overall investigation. I have probable cause to believe, and do believe, that the Devices contain evidence of the Target Offenses as noted above.

33. The Devices are currently stored in law enforcement possession, at the Drug Enforcement Administration located at 211 E 7th Avenue, Eugene, OR 97401. In my training and experience, I know that the Devices have been stored in a manner in which their contents are, to the extent material to this investigation, in substantially the same state as they were when the Devices first came into the possession of the law enforcement.

34. Based on my training and experience, I use the following technical terms to convey the following meanings:

/ / /

a. *Wireless telephone*. A wireless telephone (or mobile telephone, or cellular telephone) is a handheld wireless device used for voice and data communication through radio signals. These telephones send signals through networks of transmitter/receivers, enabling communication with other wireless telephones or traditional "land line" telephones. A wireless telephone usually contains a "call log," which records the telephone number, date, and time of calls made to and from the phone. In addition to enabling voice communications, wireless telephones offer a broad range of capabilities. These capabilities include storing names and phone numbers in electronic "address books"; sending, receiving, and storing text messages and email; taking, sending, receiving, and storing still photographs and moving video; storing and playing back audio files; storing dates, appointments, and other information on personal calendars; and accessing and downloading information from the Internet. Wireless telephones may also include global positioning system ("GPS") technology for determining the location of the device.

b. *Digital camera*. A digital camera is a camera that records pictures as digital picture files, rather than by using photographic film. Digital cameras use a variety of fixed and removable storage media to store their recorded images. Images can usually be retrieved by connecting the camera to a computer or by connecting the removable storage medium to a separate reader. Removable storage media include various types of flash memory cards or miniature hard drives. This storage media can contain any digital data, including data unrelated to photographs or videos.

c. *Portable media player*. A portable media player (or "MP3 Player" or iPod) is a handheld digital storage device designed primarily to store and play audio, video, or

photographic files. However, a portable media player can also store other digital data. Some portable media players can use removable storage media. Removable storage media include various types of flash memory cards or miniature hard drives. This removable storage media can also store any digital data. Depending on the model, a portable media player may have the ability to store very large amounts of electronic data and may offer additional features such as a calendar, contact list, clock, or games.

d. *GPS*. A GPS navigation device uses the Global Positioning System to display its current location. It often contains historical records of the locations where it has been. Some GPS navigation devices can give a user driving or walking directions to another location. These devices can contain records of the addresses or locations involved in such navigation. The Global Positioning System (generally abbreviated as “GPS”) consists of 24 NAVSTAR satellites orbiting the Earth. Each satellite contains an extremely accurate clock. Each satellite repeatedly transmits by radio a mathematical representation of the current time, combined with a special sequence of numbers. These signals are sent by radio, using specifications that are publicly available. A GPS antenna on Earth can receive those signals. When a GPS antenna receives signals from at least four satellites, a computer connected to that antenna can mathematically calculate the antenna’s latitude, longitude, and sometimes altitude with a high level of precision.

e. *PDA*. A personal digital assistant, or PDA, is a handheld electronic device used for storing data (such as names, addresses, appointments, or notes) and utilizing computer programs. Some PDAs also function as wireless communication devices and are used to access the Internet and send and receive email. PDAs usually include a memory card or other

removable storage media for storing data and a keyboard and/or touch screen for entering data. Removable storage media include various types of flash memory cards or miniature hard drives. This removable storage media can store any digital data. Most PDAs run computer software, giving them many of the same capabilities as personal computers. For example, PDA users can work with word-processing documents, spreadsheets, and presentations. PDAs may also include global positioning system ("GPS") technology for determining the location of the device.

f. *IP address*. An Internet Protocol address (or simply "IP address") is a unique numeric address used by computers on the Internet. Every computer attached to the Internet must be assigned an IP address so that Internet traffic sent from and directed to that computer may be directed properly from its source to its destination. Most Internet service providers control a range of IP addresses. Some computers have static—that is, long-term—IP addresses, while other computers have dynamic—that is, frequently changed—IP addresses.

g. *Internet*. The Internet is a global network of computers and other electronic devices that communicate with each other. Due to the structure of the Internet, connections between devices on the Internet often cross state and international borders, even when the devices communicating with each other are in the same state.

35. Based on my training, experience, and research, I know that the Devices have capabilities that allow them to serve as a wireless telephone, digital camera, portable media player, GPS navigation device, and PDA. In my training and experience, examining data stored on devices of this type can uncover, among other things, evidence that reveals or suggests who possessed or used the device.

36. Based on my knowledge, training, and experience, I know that electronic devices

can store information for long periods of time. Similarly, things that have been viewed via the Internet are typically stored for some period of time on the device. This information can sometimes be recovered with forensics tools.

37. As further described in Attachment B, this application seeks permission to locate not only electronically stored information that might serve as direct evidence of the crimes described on the warrant but also forensic evidence that establishes how the Devices were used, the purpose of its use, who used it, and when. There is probable cause to believe that this forensic electronic evidence will be on the Devices because, based on my knowledge, training, and experience, I know:

a. Data on the Devices can provide evidence of a file that were once on the Devices but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file).

b. Forensic evidence on a device can also indicate who has used or controlled the device. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence. For example, registry information, configuration files, user profiles, email, email address books, "chat," instant messaging logs, photographs, the presence or absence of malware, and correspondence (and the data associated with the foregoing, such as file creation and last-accessed dates) may be evidence of who used or controlled the device at a relevant time. Further, forensic evidence on a device can show how and when the device was accessed or used. Such "timeline" information allows the forensic analyst and investigators to understand the chronological context of access, use, and events relating to the crime under investigation. This "timeline" information may tend to either

inculpate or exculpate the device user. Last, forensic evidence on a device may provide relevant insight into the device user's state of mind as it relates to the offense under investigation. For example, information on a device may indicate the user's motive and intent to commit a crime (e.g., relevant web searches occurring before a crime indicating a plan to commit the same), consciousness of guilt (e.g., running a "wiping program" to destroy evidence on the device or password protecting or encrypting such evidence in an effort to conceal it from law enforcement), or knowledge that certain information is stored on a computer (e.g., logs indicating that the incriminating information was accessed with a particular program).

c. A person with appropriate familiarity with how an electronic device works may, after examining this forensic evidence in its proper context, be able to draw conclusions about how electronic devices were used, the purpose of their use, who used them, and when.

d. The process of identifying the exact electronically stored information on a storage medium necessary to draw an accurate conclusion is a dynamic process. Electronic evidence is not always data that can be merely reviewed by a review team and passed along to investigators. Whether data stored on a device is evidence may depend on other information stored on the device and the application of knowledge about how a device behaves. Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

e. Further, in finding evidence of how a device was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium. For example, the presence or absence of counter-forensic programs or anti-virus programs (and associated data) may be relevant to establishing the user's intent.

38. *Nature of examination*. Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit the examination of the Devices consistent with the warrant. The examination may require authorities to employ techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of the Devices to human inspection in order to determine whether it is evidence described by the warrant.

39. The review of the Devices will be performed within a reasonable amount of time not to exceed 365 days from the date of execution of the warrant. If the government needs additional time to conduct this review, it may seek an extension of the time period from the Court within the original 365-day period from the date of execution of the warrant. If the government needs additional time to complete this review, it may seek an extension from the Court.

40. If, at the conclusion of the examination, law enforcement personnel determine that particular files or file folders on the Devices or image do not contain any data falling within the scope of the warrant, they will not search or examine those files or folders further without authorization from the Court. Law enforcement personnel may continue to examine files or data falling within the purview of the warrant, as well as data within the operating system, file system, software application, etc., relating to files or data that fall within the scope of the warrant, through the conclusion of the case.

41. If an examination is conducted, and it is determined that the Devices do not contain any data falling within the ambit of the warrant, the government will return the Devices

to their owner within a reasonable period of time following the search and will seal any image of the Devices, absent further authorization from the Court.

42. If the Devices contain evidence, fruits, contraband, or is an instrumentality of a crime, the government may retain the Devices as evidence, fruits, contraband, or an instrumentality of a crime or to commence forfeiture proceedings against the Devices and/or the data contained therein.

43. The government will retain a forensic image of the Device for a number of reasons, including proving the authenticity of evidence to be used at trial, responding to questions regarding the corruption of data, establishing the chain of custody of data, refuting claims of fabricating, tampering, or destroying data, and addressing potential exculpatory evidence claims where, for example, a defendant claims that the government avoided its obligations by destroying data or returning it to a third party.

44. *Manner of execution*. Because this warrant seeks only permission to examine devices already in law enforcement's possession, the execution of this warrant does not involve the physical intrusion onto a premises. Consequently, I submit there is reasonable cause for the Court to authorize execution of the warrant at any time in the day or night.

**Conclusion**

45. Based on the foregoing, I have probable cause to believe, and I do believe, that the Devices described in Attachment A contain evidence fruits, and instrumentalities of violations of Title 21, United States Code, Sections 841(a)(1) and 846, as set forth in Attachment B. I therefore request that the Court issue a warrant authorizing a search of the Devices described in Attachment A for the items listed in Attachment B, and the seizure and examination

of any such items found.

46. Prior to being submitted to the Court, this affidavit, the accompanying application, and the requested search warrant were all reviewed by Assistant United States Attorney (AUSA) Joseph Huynh and AUSA Huynh advised me that, in his opinion, that the affidavit and application are legally and factually sufficient to establish probable cause to support the issuance of the requested warrant.

*By phone pursuant to Fed. R. Crim. P. 4.1*
KATHERINE JOLLEY
Special Agent DEA

Sworn in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone at 3:34 p.m. a.m/p.m. on May 15, 2026.

Amy E Potter
HON. AMY E. POTTER
United States Magistrate Judge

# ATTACHMENT A

## Property to Be Searched

The property to be searched are two cellular telephones: (1) a Samsung cellphone in a dark-blue colored case and (2) an iPhone cellphone in a clear case. The two devices are currently stored in law enforcement possession, at the Drug Enforcement Administration located at 211 E 7th Avenue, Eugene, OR 97401.

Device (1) a Samsung cellphone in a dark-blue colored case:







Device (2) an iPhone cellphone in a clear case:





**ATTACHMENT B**

**Items to Be Seized**

1. All records on the Devices described in Attachment A that relate to violations of Title 21, United States Code, Sections 841(a)(1) and 846 and involve Rene CAZARES since January 2026, including:

a. Lists of customers, associates, sources of supply and related identifying information.

b. Types, amounts, and prices of drugs trafficked as well as dates, places, and amounts of specific transactions.

c. Information related to sources of drugs (including names, addresses, phone numbers, vehicle information or any other identifying information).

d. Information recording Rene CAZARES's schedule or travel from January 2026 to the present.

e. Bank records, checks, credit card bills, account information, and other financial records.

2. Evidence of user attribution showing who used or owned the Devices at the time the things described in this warrant were created, edited, or deleted, such as logs, phonebooks, saved usernames and passwords, documents, and browsing history.

3. As used above, the terms "records" and "information" include all of the foregoing items of evidence in whatever form and by whatever means they may have been created or stored, including any form of computer or electronic storage (such as flash memory or other media that can store data) and any photographic form.

**Search Procedure**

4. The examination of the Devices may require authorities to employ techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of the Devices to human inspection in order to determine whether it is evidence described by the warrant.

5. The review of the Devices will be performed within a reasonable amount of time not to exceed 365 days from the date of execution of the warrant. If the government needs additional time to conduct this review, it may seek an extension of the time period from the Court within the original 365-day period from the date of execution of the warrant. If the government needs additional time to complete this review, it may seek an extension from the Court.

6. If, at the conclusion of the examination, law enforcement personnel determine that particular files or file folders on the Device or image do not contain any data falling within the scope of the warrant, they will not search or examine those files or folders further without authorization from the Court. Law enforcement personnel may continue to examine files or data falling within the purview of the warrant, as well as data within the operating system, file system, software application, etc., relating to files or data that fall within the scope of the warrant, through the conclusion of the case.

7. If an examination is conducted, and it is determined that the Devices do not contain any data falling within the ambit of the warrant, the government will return the Devices to its owner within a reasonable period of time following the search and will seal any image of the Devices, absent further authorization from the Court.

8. If the Devices contain evidence, fruits, contraband, or is an instrumentality of a crime, the government may retain the Devices as evidence, fruits, contraband, or an instrumentality of a crime or to commence forfeiture proceedings against the Devices and/or the data contained therein.

9. The government will retain a forensic image of the Devices for a number of reasons, including proving the authenticity of evidence to be used at trial, responding to questions regarding the corruption of data, establishing the chain of custody of data, refuting claims of fabricating, tampering, or destroying data, and addressing potential exculpatory evidence claims where, for example, a defendant claims that the government avoided its obligations by destroying data or returning it to a third party.